Ronald J. TURNER, As Administrator of the Estate of Charlotte M. Turner, and Individually, Plaintiff, Appellant,

v.

FALLON COMMUNITY HEALTH PLAN, INC., Defendant, Appellee.

No. 97–1253.

United States Court of Appeals, First Circuit.

Heard July 30, 1997

Decided Oct. 20, 1997.

Burton Chandler, Worcester, MA, with whom Seder & Chandler was on brief, for appellant.

Daly D.E. Temchine, Washington, DC, with whom Thomas I. Elkind and Epstein Becker & Green, P.C., Boston, MA, were on brief, for appellee.

Before BOUDIN, Circuit Judge, HILL,* Senior Circuit Judge, and POLLAK,** Senior District Judge.

BOUDIN, Circuit Judge.

Ronald Turner, on behalf of himself and as administrator of the estate of his deceased wife, Charlotte Turner, brought this suit in Massachusetts state court against Fallon Community Health Plan, Inc. ("Fallon"). The gravamen was Fallon's refusal to provide coverage for a treatment regime proposed by Charlotte Turner and her doctor to address her metastasized breast cancer. After the case was removed to federal district court, the district court granted summary judgment for Fallon, and Ronald Turner appealed.

* Of the Eleventh Circuit, sitting by designation.

** Of the Eastern District of Pennsylvania, sitting by designation.

The pertinent facts are largely undisputed. In 1991, Charlotte Turner was diagnosed with breast cancer. The disease was at first treated by surgery, chemotherapy and radiation. In May 1993, tests showed that the cancer had metastasized, was beyond control by conventional therapies, and threatened Charlotte Turner with death within 12 to 18 months. Ronald Turner was employed by General Motors, and Charlotte Turner was covered by the health coverage that Fallon provided for family members of General Motors employees.

Fallon is a health maintenance organization that provides or reimburses health care for its members. Its "Member Handbook," which is presented as "part of [the member's] contract with [Fallon]," describes in detail the various medical costs that Fallon will cover for beneficiaries. Among the express *exclusions* set forth in the handbook was "bone marrow transplant for treatment of solid tumors...." Dr. Ronald Hochman, Charlotte Turner's oncologist at Fallon, nevertheless concluded that Charlotte Turner's only hope was an autologous bone marrow transplant, a procedure by which the patient's own bone marrow is extracted, stored and then reintroduced after the patient receives high dosage chemotherapy. Marrow is the source of vital white blood cells needed to fight infection and without the transplant procedure, the high dosage chemotherapy would impair the bone marrow's ability to continue to produce white blood cells.

In May 1993, Fallon approved Charlotte Turner's request that she be evaluated by Dana Farber Cancer Institute for possible participation in its bone marrow transplant program. Fallon continued to assert that a bone marrow transplant was not a covered procedure for solid tumor cancer but said that if the treatment was recommended by Dana Farber, the request for coverage would be reviewed further by Fallon. Ultimately, Dana Farber concluded that Charlotte Turner was not eligible for the Dana Farber protocol because cancer cells had already been detected in Charlotte Turner's bone marrow.

Charlotte Turner then asked Fallon to cover her examination for eligibility to enter a program being conducted by the Duke University Medical Center. In this program, Duke not only removed bone marrow for reimplantation, in aid of high dosage chemotherapy, but also employed procedures to attempt to "purge" the marrow of its cancer cells. Fallon declined to cover the cost of a "third opinion." Charlotte Turner then had herself examined by doctors at the Duke program who concluded that she might be eligible to participate, subject to further testing. The cost of her participation in the program was estimated at $100,000.

In July 1993, Charlotte Turner and Dr. Hochman asked Fallon to pay for her inclusion in the Duke program. In August 1993, Fallon's Transplant Committee met to consider Charlotte Turner's request and the broader question whether coverage should be extended, on a case-by-case basis, to bone marrow transplants to treat solid tumor cancers either under the Dana Farber protocol or the Duke program or both. Dr. Hochman supported Charlotte Turner's application for coverage to the Duke program.

The Transplant Committee decided that, despite its handbook exclusion, it would in the future extend coverage for the Dana Farber protocol if it concluded in the particular case that the treatment was critically necessary and showed a strong likelihood of success. It concluded, however, that the Duke program had as yet produced no adequate data suggesting a likelihood of success, and therefore declined to extend coverage for the Duke program. At Charlotte Turner's request, Fallon's Grievance Committee held a hearing in September 1993 to review the decision of the Transplant Committee, but in early October 1993, the Grievance Committee upheld the denial of coverage for the Duke program.

Immediately after the Grievance Committee's decision in October 1993, Charlotte Turner underwent conventional low-dosage chemotherapy without bone marrow transplantation. She died on August 17, 1994. Ronald Turner then brought suit in the Massachusetts superior court against Fallon charging it with breach of contract, wrongful death and other state-law claims. Fallon removed the case to federal district court on

the ground that state-law claims were preempted under ERISA—the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq. See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 66–67, 107 S.Ct. 1542, 1547–48, 95 L.Ed.2d 55 (1987).

Ronald Turner responded by amending his complaint to delete the state claims and to substitute a claim under ERISA. The amended single-count complaint charged that Fallon's denial of coverage for the Duke program "denied Charlotte of the rights and benefits due under the policy and was arbitrary, illegal, capricious, unreasonable and not made in good faith and was a breach of [Fallon's] fiduciary duty which it owed to Charlotte." The complaint sought damages and a trial by jury.

In March 1996, Fallon moved for summary judgment. Ronald Turner opposed the motion and asked for further discovery, which Fallon in turn opposed. The district court then ruled that a civil ERISA action could be brought by a plan beneficiary only (in the words of the statute) "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Concluding that Ronald Turner's damage action was not authorized by ERISA, the court ruled that the case had to be dismissed and that further discovery would be futile.

Ronald Turner then sought reconsideration and also sought to amend the complaint to reassert the previously withdrawn state-law claims. He argued that if ERISA provided no federal remedy, it ought not be read to preempt his state-law claims. Alternatively, he urged that if ERISA preempted the state-law claims, then a federal remedy ought to be inferred or created by the court to permit damages for wrongful withholding of treatment under the employee benefits plan. The district court wrote a thoughtful opinion denying these requests.

■ On this appeal, we begin with Ronald Turner's claim that ERISA should be read to confer a claim for damages where, as charged in the amended complaint, a beneficiary of the plan has been denied "the rights and benefits due under the policy" or has suffered "a breach of ... fiduciary duty" in the withholding of those benefits. ERISA is a comprehensive federal statute that governs not only pension plans but also nonpension benefit plans, including the General Motors health benefits plan at issue in this case.

ERISA sets forth a half dozen civil enforcement provisions. 29 U.S.C. § 1132(a). Under the first such provision, a beneficiary may bring a federal civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). The relief expressly provided is to secure benefits under the plan rather than damages for a breach of the plan. Here, treatment coverage is no longer of any significance.

The other pertinent remedial provision authorizes civil action by a beneficiary "to obtain other appropriate equitable relief" to address violations of ERISA or to enforce the plan. 29 U.S.C. § 1132(a)(3)(B). The Supreme Court recently held in *Varity Corp. v. Howe,* —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), that this provision may permit equitable relief against a plan administrator for breaches of the fiduciary duty imposed on such administrators by ERISA. *See id.* at —— – ——, 116 S.Ct. at 1075–79. But this provision is expressly limited to providing equitable relief, and equitable relief is not being sought in this case.

Ronald Turner points to no other specific remedial provision in ERISA that might arguably be brought into play in this case. In fact, the Supreme Court has stressed that ERISA does not create compensatory or punitive damage remedies where an administrator of a plan fails to provide the benefits due under that plan. *See Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *see also Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 825 (1st Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). This is not a minor technicality: damage awards may increase effective cover-

age but may also add significantly to the costs of coverage.

The lack of an express damage remedy under ERISA does not necessarily end the story. The federal courts have regularly inferred or created remedies in the shadow of federal statutes, although the practice has waned somewhat in recent years. *See, e.g., Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). But the Supreme Court has adamantly ruled that ERISA's express remedies are a signal to courts not to create additional remedies of their own. *Russell,* 473 U.S. at 145–48, 105 S.Ct. at 3091–93. *See also Reich v. Rowe,* 20 F.3d 25, 31–33 (1st Cir.1994); *Drinkwater,* 846 F.2d at 824.

■ In the alternative, Ronald Turner argues that ERISA, if it provides no damage remedy of its own either expressly or by implication, should at least not be taken to preclude existing state remedies. Absent preemption, a health benefits plan like Fallon's could certainly be treated as a contract enforceable under state law and subject to the usual contractual remedies, including compensatory damages. Depending on the jurisdiction, state law might provide even more substantial relief, including punitive damages.

ERISA contains a vague but broadly worded preemption provision. With exceptions not relevant here, it provides that the pertinent subchapter of ERISA shall supersede any and all "State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). However this general language might otherwise have been read, the Supreme Court has construed it to preclude state claims to enforce rights under an ERISA plan or obtain damages for the wrongful withholding of those rights, *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 52–57, 107 S.Ct. 1549, 1555–58, 95 L.Ed.2d 39

(1987), and this construction has been repeatedly followed.[1]

The Supreme Court has recently set some new limits on preemption by holding that certain state laws were not sufficiently "related" to ERISA to deserve preemption. *See De Buono v. NYSA–ILA Medical & Clinical Servs. Fund,* — U.S. —, — – —, 117 S.Ct. 1747, 1752–53, 138 L.Ed.2d 21 (1997); *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.,* — U.S. —, —, 117 S.Ct. 832, 842, 136 L.Ed.2d 791 (1997). But neither of these cases involved a state's attempt to provide state remedies for what is in essence a plan administrator's refusal to pay allegedly promised benefits. It would be difficult to think of a state law that "relates" more closely to an employee benefit plan than one that affords remedies for the breach of obligations under that plan.

Ronald Turner more or less admits that existing Supreme Court precedent is against him, both as to an implicit federal cause of action and the preemption of state claims. But he says that it is grossly unjust to deny any remedy, either state or federal, to compensate in damages the victim, family or estate of one who has been wrongfully denied promised health-care benefits. Further, he argues that this gap provides a cruel incentive for plan administrators to withhold treatment or delay it as long as possible, since the claim for benefits may be mooted by the beneficiary's death.

There are in reality two quite different problems of law and policy entangled in this argument. The one that Ronald Turner seeks to present is the case of a beneficiary wrongfully denied promised benefits. There is reason to doubt that that is the true problem in *this* case (a point to which we will return), but such cases are easy to imagine and certain to occur. Compensatory damages are a conventional and potent remedy that might indeed deter misconduct and miti-

---

1. *See, e.g., Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 144, 111 S.Ct. 478, 485–86, 112 L.Ed.2d 474 (1990); *Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d 790, 794 (1st Cir.1995); *Rosario–Cordero v. Crowley Towing & Transp. Co.,* 46 F.3d 120, 126 (1st Cir.1995); *Nash v. Trustees of Boston Univ.,* 946 F.2d 960, 964 n. 8 (1st Cir. 1991); *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

gate loss, although the cost of the plan would also be increased.

On the other hand, some might think it perverse to dwell on damage remedies, which apply where the patient has died or already suffered injury, and might urge instead that courts improve access to *equitable* relief. This remedy, already available under ERISA, can address a wrongful denial of benefits while the patient is still alive and unharmed. Although Ronald Turner says that such judicial relief is readily frustrated by exhaustion of remedies rules, a failure to exhaust is easily forgiven for good reason, and no reason is better than an imminent threat to life or health. *E.g., Portela–Gonzalez v. Secretary of the Navy*, 109 F.3d 74, 77 (1st Cir.1997); *see also DePina v. General Dynamics Corp.*, 674 F.Supp. 46, 49 (D.Mass. 1987).

In all events, it is certainly a matter for reasonable debate whether a damage remedy should be added, either by judicial interpolation or by Congress. But only the Supreme Court could alter the existing case law that precludes such a remedy. And whether or not Congress ever thought about the impact on health care in particular when it wrote ERISA's remedies and preemption provisions, Congress is well equipped to revisit the issue and alter the statutory language that now stands as a bar.

Although the question of a damages remedy is an important one, it likely has no practical importance in this case. The central obligation of Fallon to Charlotte Turner is fixed by the terms of the health plan, and it would be difficult to find an exclusion more unequivocal than Fallon's written exclusion of bone marrow transplant treatment for solid tumors. Even if Fallon were treated as having modified the contract in August 1997, the modification seemingly extended only to the Dana Farber program, for which Charlotte Turner was admittedly ineligible. Thus, anything akin to a contract claim looks almost hopeless on this record.[2]

■ Ronald Turner's position is not improved by invoking fiduciary concepts under ERISA. Beneficiaries may sue a plan for breach of fiduciary duty causing individual harm, but such suits are allowed only for equitable relief and, even then, only where Congress has failed to provide more specific relief. *See Varity Corp.*, —— U.S. at ——, 116 S.Ct. at 1079. Neither condition is met here since Ronald Turner seeks damages, not equitable relief, and his grievance—a denial of benefits—is specifically addressed by 29 U.S.C. § 1132(a)(1)(B).

Furthermore, Fallon also owes a duty to other plan participants who have a continuing interest in the solvency of the plan and the expenditure of its funds for *covered* medical procedures. *See Varity Corp.*, —— U.S. at —— – ——, 116 S.Ct. at 1078–79. The notion that there is a fiduciary duty on Fallon's part to expend funds for treatment explicitly excluded from the plan would be quite a stretch. This is not a case where Fallon promised without exclusion to cover any "appropriate" or "reasonable" procedure.

Thus, in all likelihood, the real problem confronting the Turners was not one of judicial remedies but a larger and more intractable one. It is a society-wide problem of when and how to provide last-chance health care for a courageous patient faced with a mortal disease who may have a small chance at survival if provided an expensive cutting edge treatment that she cannot afford out of her own resources. This is not the kind of problem to which courts can supply the solution.

*Affirmed.*

HILL, Senior Circuit Judge, specially concurring.

Appellant, recognizing that the statutory and case law compels the district court's grant of summary judgment to appellee, addresses entreaties to us which, if appropriate at all, are appropriate to the legislative branch.

---

**2.** Also asserted were state tort claims against Fallon, essentially for negligence in investigating the Duke program and for infliction of emotional distress. It is difficult to see how denial of an expressly excluded treatment could support a negligence claim; and assuming that Fallon could legally withhold treatment, any liability for inflicting emotional distress seems unlikely.

Periodic accusations to the contrary notwithstanding, the courts are not legislative bodies.

I concur.