Kimberlee Anne WATTS, Plaintiff,

v.

ORGANOGENESIS, INC., Organogenesis, Inc. Health Benefits Plan, Medical Claims Service, Inc, Defendants,

v.

General American Life Insurance Company, Third Party Defendant.

Civil Action No. 98–11439–MEL.

United States District Court, D. Massachusetts.

Dec. 7, 1998.

Gregory R. Shaw, Brister & Zandrow, Boston, MA, Leonard F. Zandrow, John W. Brister, Brister & Zandrow, LLP, Boston, MA, Plaintiff.

Joseph H. Skerry, III, Lyne, Woodworth & Evarts, Boston, MA, for Defendants.

Matthew S. Forsyth, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Third–Party Plaintiff.

## MEMORANDUM AND DECISION

LASKER, District Judge.

On February 23, 1998, Kimberlee Anne Watts suffered a serious spinal cord injury in an automobile accident. She sustained a C–4/C–5 subluxation causing C–4 quadriplegia. As a result, she is unable to move all four extremities, and unable to control her bladder and bowel. At the time of the accident, Watts was employed by the defendant Organogenesis, Inc. and was a participant in that company's Health Benefits Plan, which is governed by ERISA. The employer and the plan, along with the company hired to administer claims, and the employer's and the plan's insurance company, are all defendants in this action for certain health care services claimed by the plaintiff since her accident. Watts moves for a preliminary injunction ordering coverage of those services.

## I.

Following emergency surgery at the Lawrence General Hospital, Watts was transferred to Boston Medical Center ("BMC"), where she was an in-patient until her discharge on July 20, 1998. Since then, she and her two young children have lived with her parents, Julian and Lee Ann Center, in the parents' home in Andover, Massachusetts. Watts and her husband are presently in the process of divorce, and he provides no financial support to her or her children.

In addition to her quadriplegia, Watts suffers from a condition unique among patients with her level of spinal cord injury ("SCI") known as autonomic dysreflexia ("dysreflexia"). Dysreflexia is an abnormal response to a problem or stimulus in the body below the point of an SCI. The condition is most likely to occur if an SCI is at or above the 6th thoracic vertebra, which Watts' injury is. In layperson's terms, dysreflexia occurs when there is a stimulus to the body below the level of the injury and the intended message cannot get to the brain through the normal route because it is interrupted by the injury. In an effort to apprize the brain that something painful or otherwise stimulating is going on, the impulse takes an alternative route, through the sympathetic chain, which is part of the autonomic nervous system. This in turn causes a rise in blood pressure that will steadily worsen until the stimulus is eliminated. Ordinarily, a dysreflexic response is triggered by something that someone not suffering from quadriplegia would sense as pain; as is discussed more fully below, Watts' condition appears to be triggered by an unusually large variety of even the most modest of stimuli.

Watts' case of dysreflexia is particularly severe, both in terms of frequency of attacks and the extreme levels to which her blood pressure rises. During her hospitalization at BMC, Watts experienced many dysreflexia attacks or "episodes". Since her discharge to home, she has suffered, on average, one to four such attacks per day.

Around the time of her discharge from the hospital, Watts, her parents, and staff at BMC arranged for the home services of a nurse because it was felt that a nurse was medically required for Watts' bowel and bladder care regimen and to monitor and control her episodes of dysreflexia. Through its administrator, the defendant health benefit plan took the position that Watts was not covered for such services. Watts and her parents, however, contracted with a home health care agency for 40 hours of nursing care spread over the weekdays, and approximately two hours of nursing services per weekend day. As Watts herself has not been able to afford the nursing services received since discharge, her parents have paid for it. As of the issuance of this opinion, the total bill for nursing services is expected to be approximately $20,000.

In July, 1998, in response to the benefit plan's refusal to cover the nursing services, Watts filed this suit on her claim for ERISA benefits. The defendants are: her former employer, Organogenesis, Inc.; the health benefits plan, the Organogensis, Inc. Health Benefits Plan (the "Plan"); and the claims services company hired by the Plan to administer claims, Medical Claims Service, Inc. Organogensis and the Plan then brought third party defendant General American Life Insurance Company into the case. Watts seeks, *inter alia*, a preliminary injunction ordering the defendants to cover her for 16 hours of home nursing services per day, seven days per week.

Because of the complexity of both the construction of the written policy (the "plan document") and the medical facts involved, additional briefing and further development of the record was required. An evidentiary hearing on the medical issues was held on October 27, 1998, and proposed findings of fact were solicited. Watts' motion for a preliminary injunction is now ready for disposition. For reasons stated below, it is granted.

## II.

The defendants oppose the injunction on a number of grounds going to Watts' likelihood of success on the merits, including Watts'

undisputed failure to exhaust the procedural steps prescribed in the plan document, as well as on the basis of various exclusions specified in the plan document. They contend that the proper standard of review of the denial of benefits in this case is the more deferential "arbitrary and capricious" standard, as opposed to *de novo* review.

Watts counters that her particular circumstances call for an exception to the exhaustion rule, and that a proper reading of the plan document establishes that the exclusions relied upon by defendants are irrelevant to her claim. She argues further that even if the exclusions must be considered, none actually applies to justify denial in her case. She does not comment on the appropriate standard of review. Watts also claims, of course, to have met her burden with respect to all of the standard requirements for a preliminary injunction.

While Watts misconstrues the plan document, she is indeed correct on all other significant points. The issue of the appropriate standard of review need not be labored over, as the result here is the same under either the *de novo* or the "arbitrary and capricious" standard. The denial of the benefits sought by Watts was unreasonable, and not supported by substantial evidence.

### Exhaustion of Procedural Requirements

■ Defendants' threshold argument is that Watts has failed to exhaust her administrative remedies, i.e., the Plan's internal procedures. In particular, defendants contend that under the exhaustion rule faced by ERISA plaintiffs, Watts was required to have fully pursued her claim for services through the various stages of internal administrative review prescribed by the Plan before commencing litigation. It is undisputed that she has not done so. Watts acknowledges the general rule, but points out that the requirement is lifted when the ordinary procedural course would be futile or inadequate. *See Turner v. Fallon Comm. Health Plan, Inc.*, 127 F.3d 196, 200 (1st Cir.1997);

*DePina v. General Dynamics Corp.*, 674 F.Supp. 46, 49–50 (D.Mass.1987). Reliance on this exception to the rule is indeed appropriate in this case.

■ An ERISA plan's procedural requirements need not be exhausted when they are inadequate. *Id.* Inadequacy is clear when the particular care sought is of an urgent nature—for example, when there is an imminent threat to the claimant' health or life. *See Turner*, 127 F.3d at 200. As is discussed in detail below, Watts has plainly demonstrated that without the nursing services she seeks, she faces an imminent and serious threat to her health and life. A failure to exhaust "is easily forgiven for good reason, and no reason is better than an imminent threat to life or health." *Id. See also Ezratty v. Com. of Puerto Rico*, 648 F.2d 770, 774 (1st Cir.1981) (exhaustion doctrine "is not to be applied inflexibly, and courts are free to use their discretion, applying the doctrine, or not, in accordance with its purposes."); *McLean Hosp. Corp. v. Lasher*, 819 F.Supp. 110, 123 (D.Mass.1993); *DePina*, 674 F.Supp. at 49–50. For these reasons, defendants' exhaustion argument is rejected.

### Construction of the Plan Document

Defendants' central argument against the preliminary injunction is that Watts has no chance of success on the merits because various provisions of the plan document apply to exclude the particular care sought. However, whether the provisions defendants rely upon are even relevant to the sort of claim Watts is making—for nursing services under the Plan's Major Medical Benefits program—is hotly contested. For that reason, the construction of the plan document is addressed first.

The provisions raised by the defendants include several express exclusions listed in a section of Appendix A which is entitled "General Medical Limitations." The General Medical Limitations ("GML") list expressly provides, *inter alia*, that coverage is excluded for the following:

21(a) "custodial care"; [1]

21(b) "care to assist the patient in the activities of daily living";

21(c) "maintenance care, not expected to improve the patient's medical condition";

27 "Unless specifically mentioned otherwise, the Plan does not provide benefits for services and supplies intended primarily to maintain a level of physical or mental function for the Plan Participant."

*Plan Document*, Appendix A, pp. 17–18. Defendants contend that any and all claims made pursuant to the plan document, including Watts', must survive the hurdles of the GML list.

Defendants further rely on a provision in Appendix A which specifies the circumstances under which benefits of the Major Medical program—which is Watts' program—are available:

upon due proof that a covered person ... incurs any of the following items of covered expense, [including ...] (f) nursing care, prescribed by the attending physician ..., but only for nursing duties and excluding all domestic activities ....

*Id.*, Appendix A, p. 5.

Lastly, they rely upon clauses (a) and (b) of the provision which defines a "covered expense" as:

A listed expense under a benefit description which will be paid under this Plan if it is (a) prescribed by a physician for the therapeutic treatment or injury or pregnancy; (b) medically necessary; (c) not more than what is determined as reasonable and customary; or (d) not excluded under any exceptions of the Plan.

*Id.*, Appendix A, p. 8.

■ Watts counters with the argument that the GML list is irrelevant to her case because her particular claim is for services expressly granted by provisions of the plan document which she contends are separate and independent of the GML list. Watts construes the plan document to require of her only that the claimed services be (1) "medically necessary" and (2) prescribed by a physician. She cites the following provisions as express grants of the relevant coverage:

*Private Duty Nursing Expense* ... Reasonable and customary charges for services performed by a registered nurse or a licensed practical nurse, when [the covered person is] not hospital or skilled nursing facility confined, are payable at 80%, following the deductible.

*Plan Document*, p. 16;

*Major Medical Expense Benefits for Covered Persons* ... [include] (f) Nursing care, prescribed by the attending physician ..., but only for nursing duties and excluding all domestic activities ....

*Id.*, Appendix A, p. 1; and

*Supplemental Accident Expense Benefit for Covered Persons* ... The Plan will pay ... (c) for nursing care, prescribed by the attending physician ..., but only for nursing duties and excluding all domestic activities ....

*Id.*, Appendix A, p. 5.

Watts' contention that the above three are the only provisions of the plan document relevant to a determination of her benefits— that the GML's are not even to be considered—is ill-founded.

With respect to the GML's, the defendants correctly point out that the "Private Duty Nursing Expense" provision relied upon by Watts is found in the merely descriptive, general "Summary Plan Description" ("Summary") part of the plan document. Indeed, the Summary is essentially a brochure-type

---

1. "Custodial care" is defined elsewhere in the plan document as:

[t]hat type of care or service where furnished and by any called name which is designed primarily to assist a Covered Person, whether or not totally disabled, in the activities of daily living. This care is not reasonably expected to improve the underlying medical condition even though it may relieve symptoms or pain. Such services include, but are not limited to: bathing, dressing, feeding, preparation of special diets, assistance in walking, getting in and out of bed, and supervision over medication which can normally be self-administered.

*Plan Document*, Appendix A, p. 8.

introduction to the broad categories of expenses covered by the Plan. It is clear from the face of the plan document that its *second* part, which is "Appendix A," is far more significant than the Summary. The Summary itself expressly provides that in the event of inconsistencies between it and Appendix A, Appendix A governs. Moreover, the list of 45 GML's found in Appendix A is the Plan's primary expression of its limits on coverage. Any interpretation of the plan document that reads the very general language of the Summary to trump the arguably inconsistent language in Appendix A would be a misfit in that it would expose the Plan to liability seemingly without limit—a proposition which the plan document itself does not support. The GML exclusions are indeed relevant to claims for nursing services under the Major Medical program, and must be considered in this case.

Arguments as to the three remaining provisions raised by the parties are basically a wash. Watts concedes that the plan document requires a physician to have prescribed the services being claimed. She also concedes that she must demonstrate that the nursing care is "medically necessary." Lastly, both the defense and Watts rely on the provision at Appendix A, page 1, specifying that nursing care is covered, "but only for nursing duties and excluding all domestic activities." In this reliance, clearly Watts concedes that she must distinguish the care she seeks from "domestic activities." These points having been conceded, the parties' reliance on the additional provisions noted above adds nothing to the required analysis.

It follows from the above construction that (1) nursing services are indeed available Watts, as a member of the Plan's Major Medical Benefits program, (2) on condition that it is established:

(a) that the services sought are "medically necessary," meaning, *first*, that Watts actually needs the particular care and treatment sought, and, *second*, that a nurse is needed to carry out that care and treatment;

(b) that the services sought have actually been prescribed by a physician;

(c) that the services sought are "reasonably expected to improve the underlying medical condition"; [2] and

(d) assuming the first three hurdles are overcome, that it is not significant that some of the tasks which a full-time nurse would end up performing when in attendance at Watts' home fall into the otherwise excluded categories of "custodial care," "assistance with activities of daily living," or "domestic activity."

### Application to Watts' Claim

While the defendants' construction of the plan document is correct, their analysis of the facts is not. The defendants' central contentions are (1) that there is no proof of a medical need for the services of a nurse in particular, and (2) that the disputed services cannot reasonably be expected to improve Watts' "underlying medical condition." However, the evidence indeed establishes that the services sought by Watts: (1) are medically necessary; (2) require a nurse; (3) have been prescribed by a physician; and (4) even though the services are not expected to improve Watts' quadriplegia, they are reasonably expected to improve her underlying condition of autonomic dysreflexia. None of the provisions raised by the defendants to justify denial of Watts' claim for nursing services apply to her case.

■ As noted above, the necessity requirement of the Plan has two components. Satisfaction of the first is undisputed. It is clear that the actual care and treatment at issue is medically necessary, and that without it, Watts' life would be in jeopardy almost immediately. The real question here is whether a *nurse*—be it a registered nurse, or a licensed practical nurse—is actually needed for the work.

---

**2.** GML's 21(c) and 27 exclude, respectively, coverage of "maintenance care, [which is care] not expected to improve the patient's medical condition," and coverage of "services ... intended primarily to maintain a level of physical or mental function ..." Since these provisions pose essentially the same, or even less stringent, hurdles as that presented by the definition of "custodial care," all three are dealt with here as one.

Defendants contend conclusorily that plaintiff's evidence fails to establish the need for a nurse. They are incorrect. The evidence, in particular the testimony of Watts' current treating physician, Dr. Susan Bergman, establishes clearly that the services of a nurse are indeed medically necessary. Specifically, the task at hand—namely, the management of Watts' autonomic dysreflexia—requires the professional skills and training of a nurse because Watts' condition is so uniquely severe that both the regularly scheduled and the emergency procedures required must be done with a high level of precision, care and skill.

The severity of Watts' dysreflexia is undisputed. As touched upon above, in response to a problem or stimulus in her lower body, Watts' blood pressure rises rapidly and to particularly dangerous levels, and she suffers, on average, one to four such attacks each day—a frequency which is uncommon. Her blood pressure must be decreased within ten minutes of an attack, which requires that effective treatment be commenced within about half that amount of time. Watts' current nurse testified that it ordinarily takes between 5 minutes and one hour to stabilize Watts' blood pressure fully, i.e., to bring it back to a normal level. If effective steps are not taken with sufficient speed, Watts runs a serious risk of a stroke, heart attack, or death. Watts' case is further made extreme because she is unusually sensitive to noxious and other stimuli, and because, unlike most dysreflexia patients, she herself sometimes cannot even sense when an attack is oncoming.

Management of Watts' dysreflexia entails both the routine, regularly scheduled bowel and bladder care procedures (the most technical of which is daily "Foley" catheterization), and emergency procedures. When an attack occurs, Watts' caretaker must perform a combination of both technical procedures such as "straight" catheterization if a Foley catheter is not in place, the straightening of a Foley catheter if one is in place, and the checking and addressing of bowel distension, and basic, non-technical steps such as loosening constrictive clothing, placement in an upright position, and checking for wrinkles in bedding, insect bites, and the like. Joseph Ouellette, R.N., who has been attending Watts since her discharge, and hence is the current on-site person managing her dysreflexia, testified credibly that controlling Watts' attacks is quite difficult because of the wide array of potential stimuli and the urgent nature of the process.

Dr. Bergman has been Watts' treating physician since Watts' discharge from BMC in July. She is highly qualified in her field of physiatry, or "rehabilitation medicine," having served since the mid–1980's as an attending physician at, and one-time Clinic Director of, the New England Regional Spinal Cord Injury Center located at BMC. Dr. Bergman specializes in the treatment of SCI patients, and recently took the first board certification examination ever offered in SCI medicine. Her work is primarily with patients who have been discharged from hospitals to home settings.

Dr. Bergman testified that she has treated approximately 600 SCI patients suffering from autonomic dysreflexia, and that in her experience, only 4 or 5 have suffered cases as severe as Watts'. Demonstrating how serious Watts' condition is, Dr. Bergman recounted an attack precipitated during a routine medical visit by the doctor's simple movement of Watts' arm—an attack Dr. Bergman relayed as unnerving even to someone with her level of experience and expertise. It is also significant that Dr. Bergman prescribed Watts a nitroglycerine ointment referred to as "nitropaste" immediately upon Watts' discharge from BMC due to the severity and frequency of her dysreflexia. Nitropaste is applied to the skin of someone with a dangerously high spike in blood pressure in what Dr. Bergman called a "stopgap" effort for until the patient can get to a hospital. Nitropaste must be applied with caution, and it is highly unusual for a physician to prescribe it to a recently discharged patient.

Against this backdrop, Dr. Bergman's unequivocal testimony was that "managing Kim's dysreflexia, in particular, needs to be done by a nurse." She explained that "nurses are trained to monitor blood pressure," that doing so requires motor skills and training in how to react to blood pressure

changes, and that Watts' blood pressure is "very unstable" and "extremely difficult to control." The affidavit of Dr. Sungyul Kim of BMC, who preceded Dr. Bergman as Watts' primary treating physician throughout her stay at BMC, buttresses Dr. Bergman's testimony. He concludes that Watts' "autonomic dysreflexia presents a medical emergency which warrants and requires the assessment and management skill of a trained, professional nurse."

In sum, the evidence establishes that managing Watts' dysreflexia means controlling her blood pressure through a variety of measures—some regularly scheduled (such as catheterization), and some urgent; some requiring technical expertise, and some clearly non-technical but requiring speed and skill. Because of both the dramatic and frequent nature of Watts' dysreflexia, and the extreme risks involved, the entire process of the management of Watts' blood pressure must be done by a particularly skilled, trained professional—namely, a nurse.

To counter the testimony of Watts' two doctors and Mr. Ouellette, the defense broached the topic of a manual of the Paralyzed Veterans Association which plaintiff's witnesses acknowledged was a respectable and widely accepted piece of literature. The defendants highlight the fact that despite the manual's having been designed specifically for laypersons who deal with quadriplegic patients, it addresses both catheterization in general and the management of dysreflexia. While this may be true, however, Dr. Bergman's testimony that the manual addresses only the "early stages" of dysreflexia—as opposed to the full-blown, severe attacks experienced by Watts daily—effectively discounts any significance of the manual to this particular case.

The defense also called Tara Marie Mahoney to testify. Ms. Mahoney is a registered nurse who worked in the field of home health care from 1991 through September, 1998, all but the final year with the Visiting Nurses Association of the North Shore, and then with Abbey Home Care. Abbey is the organization with which Watts' family has contracted for the services of Mr. Ouellette.

Prior to Mr. Ouellette's assignment, immediately upon Watts' discharge to home, Abbey sent Ms. Mahoney to visit Watts to determine, in Ms. Mahoney's words, "how much the patient and the family ... [were] knowledgeable ... as to Kimberlee's medical condition, and ... whether her medical condition at the time of discharge from the hospital was stable." While her testimony was somewhat confused as to her precise role and activities in attending Watts, the bottom line is that following a handful of short visits during Watts' first few days home, Ms. Mahoney "determined that [Watts] would need [her], as a registered nurse, to visit her one to three times a week, to continue to assess her medical status and check for any acute changes and to support and teach the family how to care for the patient."

While the defendants urge that great weight be attached to this—their only witness's—determination of Watts' needs, Ms. Mahoney's testimony was not persuasive. Her determination that Watts needs only two to three "intermittent" nurse visits per week, and further testimony that she had concluded that Watts' parents could be trained to prevent and manage her dysreflexia, on their own, within two weeks of discharge, run directly contrary to the findings and testimony of Watts' two long-term, primary attending physicians, both specialists in rehabilitation medicine and SCI's, and the nurse whom Abbey Home Care eventually assigned to Watts on a long-term, 40 hour per week basis. Considering the powerful testimony about the severity of Watts' dysreflexia and the medical need for a nurse by these three more highly qualified and experienced witnesses, along with the fact that the amount of time Ms. Mahoney spent with Watts' was negligible, her testimony as to Watts' needs simply cannot be accepted.

On the other hand, there is some significance to what Ms. Mahoney had to say about the ability of personal care attendants (PCA's), or home health aides ("HHA's")— whom she testified are the same as PCA's, to perform catheterization on quadriplegic patients. While she initially stated that at the Visiting Nurses Association of the North Shore, she knew of non-nurses performing

bowel and bladder care for home-bound patients, she clarified on cross-examination that when at North Shore as a supervisor, she had in fact never allowed a PCA or a HHA to catheterize a quadriplegic patient. She further testified that at Abbey Home Care, HHA's were expressly prevented from performing catheterization. Most significantly, while Ms. Mahoney attempted to explain the fact that PCA's or HHA's with whom she had worked could not catheterize quadriplegics only because of "corporate policy," she ultimately conceded that North Shore's and Abbey's policies in that regard were in fact the industry standard.[3] Assuming that is the case, it is clear that even unusually capable PCA's or HHA's would be unable to perform the medically required catheterization on Watts, and thus hiring a nurse would be necessary.

Other than the Veterans Association manual and Ms. Mahoney's testimony, the defendants failed to produce any noteworthy evidence in rebuttal to Dr. Bergman's testimony and Dr. Kim's affidavit. They called no physician, as either an expert or a fact witness, to the stand. Their argument that because Watts' parents had each been trained by BMC to catheterize her and otherwise deal in emergencies with dysreflexia, and each had catheterized her once or twice, nurses were not required is without merit. It would be absurd for parents living with a quadriplegic child not to have been so trained, but it is equally absurd to construe that training as proof that non-nurses can, on a regular and continuous basis, manage with sufficient skill and competence a case of dysreflexia as severe as Watts'.[4]

■ The next defense is essentially that each of the tasks involved in the management of Watts' dysreflexia is, when broken down, "an activity of daily living," or simple "custodial" or "domestic" type care. This argument is rejected because, while bowel and bladder care and personal hygiene, and even keeping clothing and bedding neat and the like, are mere activities of daily living or custodial or domestic activities for most people, including most disabled persons who require assistance with those activities, they are not for Watts. As explained in detail above, all of these tasks, the technical and the non-technical, are part of the medically required management of her extreme case of dysreflexia. The fact that they are routine, "domestic" tasks for the majority does not diminish the health-care significance of their being performed with the utmost care and skill for Watts.·

■ The defendants make the related argument that even if a nurse is medically necessary for her bowel and bladder care, Watts is not entitled under the plan document to the undisputably *purely* domestic services that Mr. Ouellette testified he currently performs when not doing the "medically necessary" tasks. These include feeding and bathing, and moving Watts to her sling chair. In other words, the defendants contend that Watts is, at most, entitled to "intermittent" nursing services. The argument is taken to mean that a nurse should either come and go from Watts' home, or sit idle when not catheterizing Watts or attending to a medical emergency. The argument is rejected.

■ The facts of Watts' particular need for a nurse and the frequent, emergency

3. Such evidence comports with the undisputed fact—which has been raised numerous times in this case—that Medicaid regulations currently prohibit coverage for PCA's or HHA's catheterizing anyone, indicating, at the very least, that the Medicaid prohibition has impacted the greater home health care industry to the extent that at present only nurses, not lesser trained attendants, are available to perform catheterization of quadriplegics living at home.

4. It is also worth noting that Watts' father testified that the family has had extreme difficulty even in hiring and retaining personal care attendants or home health aides. His undisputed testimony was that upon interviewing 30 to 40 applicants since July, the family has hired at least 10 attendants, the majority of whom were highly unreliable and/or chose not to return after relatively short engagements. While this is not conclusive evidence about the state of the market for personal care attendants, it does indicate that even if such persons were trained to manage severe cases of dysreflexia, for whatever reasons, diligent searching by Watts' family for a reliable, long-term, non-nurse caretaker would likely be fruitless.

nature of her dysreflexia preclude the intermittent visit possibility. As to the sitting idle option, judicial notice may be taken of the fact that most nurses in all sorts of settings spend at least some of their time doing unskilled tasks such as helping patients move, get comfortable, eat, clean themselves, etc. · They accomplish these tasks in and around their more technical, skilled duties. Presumably, this arrangement contributes to efficiency, and, more importantly, provides extensive patient contact, which in turn facilitates the nurse's more technical, medical functions. Moreover, in Watts' case in particular, the nurse's role is to monitor and control dysreflexic responses to a whole host of environmental factors. It can be inferred from the evidence discussed above that this requires detailed attention to all that is happening to Watts' body during her waking hours, be it feeding, cleaning, or the like.

█ The defendants' remaining argument is that the services sought by Watts are excluded under the plan document's definition of "custodial care" because it is care "not reasonably expected to improve the underlying condition." They argue that the word "the" in the definition precludes the consideration of more than a single "underlying medical condition," which, they contend, in this case is Watts' *quadriplegia*—a condition which, undisputedly, in the present state of medical knowledge, will not improve. They argue in the alternative that even if the plan document allows for more than one underlying condition, and Watts' dysreflexia is considered as such, first, "it is undisputed that the condition ... itself ... cannot be cured," and second, "there is no evidence that routine bowel and bladder care is reasonably expected to improve [dysreflexia]."

█ As to the threshold construction argument, Watts is correct in her citation to the general insurance contract interpretation rule that the use of the singular includes the plural unless it is clear that parties intended otherwise. *See Couch on Insurance 3d,* § 22:5 at 22–12 to 22–13. An intent to limit the insured to a single underlying medical condition is not evident either in the plan document itself or elsewhere in the record.

Furthermore, Dr. Bergman testified that Watts' dysreflexia was indeed an "underlying medical condition." If the phrase is a term of art, then a medical expert's unrebutted designation of the dysreflexia as such is sufficient as the last word on this issue. If it is not, then use of the phrase in the plan document is ambiguous, and therefore should be construed in accordance with the singular/plural rule cited above.

█ As to the possibility of improvement of dysreflexia, Dr. Bergman's testimony that Watts' condition can indeed improve over time, was unrebutted. She explained that dysreflexia commonly "improves" through the successful identification of the stimuli most responsible for provoking attacks. Once a patient's medical team identifies the significant stimuli, or "triggers," they can be controlled, eliminated, and/or treated; the patient becomes less susceptible to attacks and more able to avoid and control attacks, and life expectancy returns to normal. Dr. Bergman testified that among her close to 600 past and present patients with dysreflexia, the "final cause [of the attacks was treated] in all but one [case]." The triggers in this case have thus far eluded identification. Dr. Bergman is hopeful, however, and feels that despite the severity of Watts' condition, with the maintenance of a proper course of management of the dysreflexia, the condition will eventually improve. Furthermore, on a more discrete level, there is no doubt that proper, skilled management of Watts' condition during emergencies leads to what is essentially an instantaneous "improvement" of the dysreflexia.

The additional plan-based argument asserted by defendants at the commencement of these proceedings—that the disputed nursing services had never actually been "prescribed" as required by the plan document—has apparently been dropped. This is not surprising; considering Dr. Kim's and Dr. Bergman's recommendations and testimony, the argument clearly had no merit.

Finally, while the defendants have not pursued argument with respect to the preliminary injunction standard other than the "success on the merits" argument which is

rejected above, it is necessary to note that Watts has indeed met her burden with respect to all elements of that standard.

First, the requisite risk of irreparable harm has been demonstrated. According to the medical evidence, Watts runs a serious, *daily* risk of stroke, heart attack, or death if her dysreflexia is not managed properly, and proper management requires a nurse for 16 hours per day, i.e., all of Watts' waking hours. At present, Watts is without a nurse for half that time Monday through Friday, and for the vast majority of that time on weekends. This lack of nursing in and of itself, while it has not resulted in disaster yet, demonstrates sufficient risk. Moreover, Watts' father's undisputed testimony is that her parents will soon run out of money to pay for 40 hours of nursing care she is currently receiving. This increases the risk considerably. As to the balance of harms, whatever financial harm the defendants would suffer from the issuance of a preliminary injunction shrinks in significance when compared to the health risks Watts would face without the nursing services. Lastly, it is not argued that relief should be denied due to public policy considerations.

### III.

For the above reasons, Watts' motion for a preliminary injunction is granted to the following extent. It is ordered that until further notice the Organogenesis, Inc. Health Benefits Plan: (1) authorize, pre-approve, and approve reasonable and customary charges for services to be performed by a registered or licensed practical nurse on Watts at her home, as has been prescribed by her attending physician, from the date of this order; and (2) reimburse Watts and her family members for any and all payments they have made for skilled, at-home nursing care from the date of her discharge from the Boston Medical Center in July, 1998, to the date of this order.

The likelihood of success on the merits of Watts' claims against defendants Organogenesis, Inc. and Medical Claims Service, Inc. is uncertain because they have, in motions to dismiss, raised doubt as to whether they are proper parties to this case. By endorsement order on today's date, those motions are being denied without prejudice to allow for further discovery relevant to those defendants' involvement in Plan administration. Accordingly, the present motion is denied as to both Organogenesis and Medical Claims Service, without prejudice to further developments.

The request for prejudgment interest is denied as premature, without prejudice to renewal in the event a final judgment is entered in plaintiff's favor, and the application for attorney's fees is denied without prejudice to renewal upon a separate motion establishing justification.

Submit decree on notice.