Burnes, J.
INTRODUCTION
This is yet another case in which an employer seeks to use the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. §§1001 et seq., as a shield to protect it from wrongful acts against an employee. See Pace v. Signal Technology Corp., 417 Mass 154, 160 (1994); Leyland v. Plymouth & Brockton Street Ry. Co., 44 Mass.App.Ct. 427, 431 (1998). Although this ploy often works, see e.g., Ingersoll-Rand. v. McClendon, 498 U.S. 133 (1990), Felton v. The Unisource Co., 940 F.2d 503 (9th Cir. 1991), it fails in this case.
THE DISPUTE
Westinghouse Electric Supply Corporation (“Westinghouse”) petitions for judicial review of the decision of the Massachusetts Commission Against Discrimination (“the Commission”) pursuant to G.L.c. 151B, §6 and G.L. 30A, §14. Westinghouse contends that the Commission’s decision is unlawful because (1) the claim of respondent Mark Chanson (“Chanson”) for handicap discrimination is preempted by ERISA and (2) the determinations that Chanson is handicapped within the meaning of G.L.c. 151B (“Chapter 151B”), was discriminated against by Westinghouse on account of such handicap, and is entitled to a $250,000 emotional distress award are not supported by substantial evidence. Westinghouse alternatively seeks remitittur of the $250,000 emotional distress award. Chanson opposes Westinghouse’s petition and, pursuant to G.L.c. 151B, §§5, 9, seeks attorney’s fees and costs associated with defending against this petition and Westinghouse’s two motions for reconsideration brought before the Commission. For the following reasons, the decision of the Commission is AFFIRMED and Chanson’s motion for attorneys fees and costs is ALLOWED in part and DENIED in part.
*662 BACKGROUND[2]
Chanson had more than twenty years experience as a salesman (twenty years with one company) before coming to Westinghouse. In August 1988, Westinghouse hired Chanson as an inside salesman in its Worcester office. Chanson was responsible for filling orders for sales representatives who worked outside the company. His responsibilities included answering customer calls, processing orders, informing customers as to the status of their orders, and ensuring customers’ receipt of orders. Chanson excelled in a training course and received quarterly bonuses and performance raises.
In May and June of 1989, Chanson became veiy sick. He began losing weight, had chronic diarrhea and was unable to control his bowels. Chanson became very nervous and anxious.
Until June 14, 1989, shortly after he became ill, his performance record was unblemished. On this date, Chanson received a letter from his supervisor, Michael Remarski (“Remarski”), reprimanding him for falling to inform one of Westinghouse’s top customers that he had placed some ordered material on back order.
In September 1989, Chanson was diagnosed with Crohn’s disease and began a six-week admission at the Medical Center of Massachusetts. Crohn’s disease is an incurable, chronic disease characterized by fatigue, weight loss, loss of appetite, diarrhea, rectal bleeding and loss of bodily fluids and nutrients. Released on November 4, 1989, Chanson recuperated at home until his return to work on December 11, 1989.
Upon his return, Chanson spoke to Remarski about his condition, explaining that he would need to “take things slowly” and would need assistance in covering the front desk because of unavoidably frequent trips to the bathroom. He told Remarski he might need to use the bathroom as much as twenty times in a day. Westinghouse assigned Chanson to lighter duties and relieved Chanson of responsibility for several high-pressure accounts. Chanson also wore protective pads and brought a change of clothes to work. During the next month, Chanson received no criticism of his performance.
On or about January 15, 1990, Chanson presented to Gregory Thomas (“Thomas”), the assistant branch manager, a hospital bill for $55,000.[3] Thomas expressed shock at the size of the bill and asked Chanson about the nature of Crohn’s disease. Chanson explained that the disease was incurable and could recur at any time. A week or so later, Chanson gave another portion of the bill to Thomas, who again expressed shock at the cost, stating, “This bill was even higher than the other.”
After he gave the hospital bills to Thomas, Chanson felt that Remarski and Thomas scrutinized him more closely, subjecting him to increased pressure and criticism of his performance, including criticizing him for the time he spent away from the front desk. Chanson testified he felt he was being “watched” and informed his wife that he was starting to feel “more inadequate and strained.”
There was substantial evidence presented at the hearing to support Chanson’s impressions. Remarski and Thomas accused Chanson of failing to return customer calls that Chanson had returned; they accused him of failing to communicate with customers when he had.
On January 24, 1990, Chanson received an order from an outside salesman which included certain items which were not in stock. He ordered those items from three different places; when they did not come in, he reordered them. The customer received the items (worth $600) eight days after ordering them. All items were delivered by February 1, 1990.
The outside salesman wrote a memo dated January 31, 1990, complaining about Chanson. According to a Westinghouse memo authored by Remarski and Thomas, the customer complained on February 1, 1990, the day that the last of the items was delivered.
On February 2, 1990, Remarski and Thomas took Chanson to lunch. They placed him on probation “due to [his] history of lack of follow thru (sic) and this specific incident.” The memo went on to say that Chanson would need to realize a "markable (sic) improvement” or face suspension or termination. Within the next month Chanson both explained to Remarski that he had provided the customer with items in stock, but had to back-order the missing items, and showed him the order forms.
Westinghouse terminated Chanson on March 13, 1990 “for performance reasons.”
The Commissioner found that Chanson was devastated by his termination, not knowing “what to do” about the loss of his job and his health. Chanson’s wife testified that he “fell apart” and was depressed. Chanson suffered from insomnia, constant diarrhea, and stomach pain, all of which were exacerbated by his termination.
Chanson filed a charge of discrimination with the Commission on March 28, 1990. On December 15, 1994, Commissioner Michael Duffy held a hearing; he issued his decision on April 28, 1995. The Commissioner found that Chanson was an “otherwise qualified handicapped individual,” that Westinghouse had discriminated against Chanson on the basis of his handicap in violation of G.L.c. 151B, §4(16), and that Chanson had suffered severe emotional distress as a result. The Commissioner awarded damages for lost wages, medical expenditures, and for emotional distress in the total amount of $250,000. On September 30, 1996, the Commission affirmed the decision of the Hearing Commissioner and the award of damages.
After the Full Commission Decision, but before the Commission’s Final Order was issued, Westinghouse *663 filed a motion for reconsideration with the Commission. This motion was never acted upon. Westinghouse later renewed its motion for reconsideration. On July 7, 1997, the Commission issued its Final Order, in which it declined to entertain Westinghouse’s motions for reconsideration as improper both procedurally and jurisdictionally. The Commission noted that the appropriate route for review of an agency decision is an appeal to this Court pursuant to G.L.c. 30a, §14. The Commission allowed Chanson’s motion for attorneys fees.
DISCUSSION
I. The Employee Retirement Income Security Act
Westinghouse urges that Chanson’s claim of discrimination under Chapter 15IB is preempted by ERISA’s broad preemption provision, §514(a) (29 U.S.C §1144(a)) (“Section 514(a)”), because Chanson’s claim is that Westinghouse terminated him to avoid paying future health insurance benefits. ERISA provides the sole basis for such a claim by virtue of its anti-retaliation provision, §510 (29 U.S.C. §1140) (“Section 510”).
Westinghouse neglected to raise the defense of preemption before the Hearing Commissioner or the full Commission prior to the Full Commission Decision. It was not until after the Full Commission Decision, although before the Final Order, that Westinghouse first asserted ERISA preemption. Nevertheless, this Court necessarily reaches this issue, but finds that Chanson’s claim is not preempted.
A. Waiver
Normally, in an appeal under G.L.c. 30A, §14, a court will not consider issues that have not been raised before the Commission. See N.Y. & Mass. Motor Serv., Inc. v. MCAD, 401 Mass. 566, 579 (1988); see also Katz v. MCAD, 365 Mass. 357, 364 (1974) (“No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances”). ERISA preemption, however, concerns subject matter jurisdiction, a defense that may be raised at any time.[4] Mass.R.Civ.P. 12(h)(3); Chestnut-Adams Ltd. Partnership v. The Bricklayers & Masons Trust Funds of Boston, 415 Mass. 87, 90 (1993); Barry v. Dymo Graphic Systems, Inc., 394 Mass. 830, 836 (1985).
B. ERISA Preemption
Section 514(a) of ERISA provides that except for a limited number of actions, ERISA “shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in §1003 (a) of this title and not exempt under § 1003(b) of this title.” 29 U.S.C. §1140. “State law” is broadly defined as “all law, decisions, rules, regulations, or other State action having the effect of law . . .” 29 U.S.C. §1144(c)(1).
Congress established ERISA primarily to relieve the administrative burden imposed upon employers by inconsistent state regulation of benefit plans. See Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 11 (1987). “Congress intended preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations.” Id.
The underlying purpose was to “promote the interests of employees and their beneficiaries in employee benefit plans.” Ingersoll-Rand, 498 U.S. at 137; see Pace, 417 Mass. at 160; Leyland, 44 Mass.App.Ct. at 430. Among other things, it made it unlawful for an employer to discriminate against an employee for exercising rights under the plan. 29 U.S.C. §1140 (“Section 510”).[5]
The Supreme Court has construed ERISA broadly. For a law to “relate to” a benefit plan, it only needs to bear some “connection with or reference to such a plan.” Shaw v. Delta Airlines, Inc., 463 U.S. 85, 97 (1983). Since Shaw, the Supreme Court has put a finer point on its analysis. See Cal. Div. Of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 519 U.S. 316, 325 (1997) (court looks to objectives of ERISA as guide to scope of state law Congress intended to preempt and to nature and effect of state law on ERISA plans); Ingersoll-Rand, 498 U.S. at 139-49 (question of whether state action is preempted by federal law is one of Congressional intent); see also Turner v. Fallon Community Health Plan, Inc., 127 F.3d 196, 199 (1st Cir. 1997) (“The Supreme Court has recently set some new limits on preemption by holding that certain state statutes are not sufficiently ‘related to’ ERISA to deserve preemption”).
“The starting presumption [, however,] is that Congress did not intend to supplant state law.” DeBuono v. NYSA-ILA Med. and Clinical Serv. Fund, 117 S.Ct. 1747, 1751 (1997). Preemption is appropriate only when it furthers the Congressional intent. See Fort Halifax Packing, 428 U.S. at 19. Congress did not intend to preempt all state laws that might impact benefits, but only those affecting the administration of benefits. See id. The key distinction is whether a state law affects an employee benefit plan, or merely affects certain employee benefits. Id. For claims that are preempted, Section 502 of ERISA is the exclusive remedy. See Ingersoll-Rand, 498 U.S. at 144.
A “generally applicable [state] statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan” is not preempted. Id. at 139. When existence of an ERISA plan is not a “critical element” of the state law cause of action, preemption is inappropriate. See DeBuono, 117 S.Ct. at 1752; Cal. Div. of Labor Standards Enforcement, 519 U.S. at 324; Ingersoll-Rand, 498 U.S. at 139-40. Preemption is not warranted when the state law does not act “immediately or exclusively upon ERISA plans.” See Cal. Div. of Labor Standards Enforcement, 519 U.S. at 325. A *664 state law may have an indirect economic influence or impose some burdens upon the administration of ERISA plans and yet not “relate to” ERISA within the meaning of §514(a). See DeBuono, 117 S.Ct. at 1752; New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 659 (1995).
Westinghouse contends that the Commission based its decision on the theory that a retaliatory motivation to punish Chanson for presenting hospital bills and to avoid paying potential bills in the future inspired his termination. Such a motivation would bring Chanson’s claim within the scope of Section 510. See Ingersoll-Rand Co., 498 U.S. at 140, 142 (case falls squarely within §510 when employer has pension-defeating motive in terminating the employment); Felton, 940 F. 2d at 512 (“In §510 actions, the employer has fired . . . the employee either to evade the public policies underlying ERISA or in retaliation for the employee’s exercise of his right to insurance . . . benefits”). If Chanson’s claim fell within §510, his discrimination claim would be preempted. See Ingersoll-Rand, 498 U.S. at 144.
Let’s see if we can understand Westinghouse’s argument. Westinghouse states that it did not discriminate against Chanson, but if it did, it did so to prevent Chanson from using his health insurance benefits. If this is Chanson’s claim, says Westinghouse, it, the employer, can defend that claim by using Section 510, a section of ERISA designed to protect employees. See Leyland, 44 Mass.App.Ct. at 431. That is, argues Westinghouse, if it did anything wrong here, Chanson is, or would have been,[6] limited in his recovery to the benefits due to him under his health insurance plan. 29 U.S.C. §1132; see Gaskell v. The Harvard Cooperative Society, 762 F.Supp. 1539, 1543-40 (D.Mass. 1991). ERISA does not provide a remedy for a claim of handicap discrimination in employment.
But Chanson is not making the argument that Westinghouse attributes to him. Chanson maintained throughout the proceedings before the Commission that he was fired because of his handicap, Crohn’s disease. Chanson’s pro-se complaint stated, “I believe that I am discriminated against because of my handicap.” He did not claim that Westinghouse denied him benefits; he did not allege that Westinghouse terminated him in order to avoid paying future benefits; he did not file an ERISA claim. Indeed, Westinghouse paid the bills for Chanson’s health care, before it fired him. Furthermore, Westinghouse acknowledged to the Commission that, under certain circumstances, that Chanson’s “firing would not have limited the company’s liability under its health care plan.” Had Chanson elected to continue his benefits under a COBRA plan, Westinghouse would still have had to pay for Chanson’s health care.
In the hearing before the Commissioner, when asked why he thought Westinghouse terminated him, Chanson responded, “Because my disease can be recurrent. I — My disease — -The only way I can put it is it has no rules. There’s no cure. It could come back tomorrow morning. I can’t, in a sense, make plans and I think that — I feel that this is why they let me go.” TR. at 62. When asked on cross-examination if he thought he was terminated because he will “always have a bill,” Chanson stated, “I didn’t say as far as I would always have a bill. I don’t know what’s going to happen tomorrow morning in a sense where the abdominal pains, the diarrhea, in that that (sic) can always recur . . ,”[7] TR. at 64.
Chapter 151B is a statute of “general applicability,” that is, claims based on this statute do not “depend on the existence of an ERISA plan,” nor do they bear more than an “indirect economic influence” upon a plan. Chanson is not seeking benefits under a plan nor is he arguing that Westinghouse wrongfully denied benefits. Success on his Chapter 15 IB claim will not “directly affect the administration of benefits under the plan.” Pace, 417 Mass. at 159-60. ”[T]he real gravamen” of Chanson’s complaint is that Westinghouse discharged him as a result of handicap discrimination. Yageman v. Vista Maria, Sisters of the Good Shepherd, 767 F.Supp. 144, 145 (E.D. Mich. 1991). The relationship of Chanson’s claim to, or its effect upon, his insurance plan, is purely incidental. See Pace, 417 Mass. at 160, quoting Shaw, 463 U.S. at 100 n.21 (no preemption where relationship to ERISA is “tenuous, remote or peripheral”).[8] A state discrimination claim does not automatically “relate to" ERISA; a remedy under a state statute for discrimination may exist separate and apart from a claim for retaliation under §510. See Rokohl, 77 F.3d at 129-30; Felton, 940 F.2d at 509-10. Each cause of action is based on a different theoiy and requires proof of different elements.[9]
The Hearing Commissioner determined that Chanson’s termination resulted from Westinghouse’s discrimination on the basis of Chanson’s handicap. He found that Chanson received no complaints concerning his performance until June of 1989, when he first began to experience symptoms of his illness, and that Remarski and Thomas, increased their scrutiny and criticism of Chanson’s performance after January 15, 1990, when Chanson presented the first hospital bill and informed Remarski of the recurrent and incurable nature of his disease.[10] The Commissioner stated, “It is significant that the only written criticisms Complainant received coincided with the onset of his illness and the subsequent treatment and adjustment periods.”
Even if Westinghouse’s termination of Chanson was partially motivated by a desire to avoid paying insurance benefits, Chanson still has a claim under Chapter 151B. Chapter 151B prohibits an employer from dismissing a disabled, yet otherwise qualified and capable employee, because of his or her handicap. If Westinghouse did, indeed, fire Chanson because the *665 medical bills to treat his condition were too high, then Westinghouse essentially dismissed Chanson because of his handicap. The cost of accommodation is not relevant to answering the fundamental question: Did Westinghouse discriminate against Chanson? See Dartt, 427 Mass. at 12-17 (cost of dealing with handicap, in Dartt, the cost of workers compensation, is irrelevant to determining whether the defendant discriminated against the plaintiff).
Interpretation of Chapter 15 IB is guided by judicial analyses of the Americans with Disabilities Act (“ADA"), despite the fact that the ADA was enacted after Chapter 15IB. Id. Both statutes prohibit discrimination against a qualified individual with a disability because of that handicap. See 42 U.S.C. §12112(a); G.L.c. 151B, §4(16). Since both acts seek to prohibit the identical actions, the Supreme Judicial Court looks to the ADA and judicial analyses of it to guide its interpretation of Chapter 151B. Dartt, 427 Mass. at 10.
Under the ADA, and therefore Chapter 151B, an employer cannot refuse to hire or accommodate an otherwise capable, handicapped individual merely because doing so would cause the company to incur expenses or because the cost of accommodation is too high in relation to the employee’s salary. Steven Epstein, In Search of a Bright Line: Determining When an Employer’s Financial Hardship Becomes “Undue” Under the Americans with Disabilities Act, 48 Vand.L.Rev. 391, 403 (1995); Sue Krenek, Beyond Reasonable Accommodation, 72 Tex.L.Rev. 1969,1972 (1994) (“Krenek”). While this type of discrimination may be rational in economic terms, it is, nonetheless, unlawful. Krenek, supra at 1984, n. 91.
Allowing companies to dismiss handicapped employees simply because continuing to employ them leads to increased costs undermines the goals of the ADA. That statute, and ones like it, seek to provide people with disabilities the opportunity to compete on an equal basis with nondisabled people and prevents the American public from enduring unnecessary expenses resulting from dependency and nonproductivity that unemployed handicapped individuals would bring upon American society.[11] 42 U.S.C. s. 12101(a)(6); see Nelson v. Thornburgh, 567 F.Supp. 369, 382 (E.D. Penn. 1983) (failure to accommodate and hire handicapped persons imposes a significant cost on American society and the American economy). Requiring companies to expend some reasonable, monetary amounts to accommodate a handicapped employee is a small price to pay compared to the costs that America in general and the individual specifically would bear if disabled persons were excluded from the workplace. Nelson, 567 F.Supp. at 382. Certainly a company as large as Westinghouse can reasonably absorb Chanson’s medical costs without jeopardizing its financial status. See id. (finding that a federal department with a $300,000,000.00 budget cannot claim that it would endure undue financial hardship when required to accommodate its handicapped employees). In fact, Westinghouse is required to do so under Chapter 15 IB and cannot argue “cost” as an affirmative defense to its responsibility to reasonably accommodate chanson’s handicap. Doing otherwise defeats the purpose behind Chapter 15IB.
As in Leyland, the success of Westinghouse’s argument turns on the determination of fact. Leyland, 44 Mass.App.Ct. at 429. Did Westinghouse discriminate against Chanson? The Commission found that substantial evidence supported the Hearing Commissioner’s determinations. See Part II of this opinion, below. This Court will not disturb these well supported findings of fact. See Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 676 (1993); N.Y. & Mass. Motor Serv., 401 Mass. at 574.
II. The Commission’s Decision
Because Chapter 151B grants the Commission broad powers to investigate, act upon, and remedy the effects of discrimination, this Court’s review of the Commission’s actions is limited. See Ramsdell, 415 Mass. at 676; East Chop Tennis Club v. MCAD, 364 Mass. 444, 450 (1973). For this Court to substitute its judgment on a matter lying within the Commission’s expertise would “render meaningless the administrative scheme enacted by the legislature.” East Chop Tennis Club, 364 Mass. at 450. Rather, this Court must accord due weight to the Commission’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. See G.L.c. 30A §14(7); Iodice v. Architectural Access Bd., 424 Mass. 370, 375-76 (1997); Smith College v. MCAD, 376 Mass. 221, 224 (1978).
This Court must defer to the fact-finding function of the Commission, “including its right to draw reasonable inferences from the facts found,” where there is substantial evidence to support its findings and where there is no error of law. Ramsdell, 415 Mass. at 676; N.Y. & Mass. Motor Serv., 401 Mass. at 574. “Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.” Salaam v. Comm’r of the Dep’t of Transitional Assistance, 43 Mass.App.Ct. 38, 39 (1997), citing G.L.c. 30A, §1(6); see also Arnone v. Comm’r of the Dep’t of Social Services, 43 Mass.App.Ct. 33, 34 (1997). Furthermore, the Hearing Commissioner, not this Court, evaluates the credibility of the witnesses. Ramsdell, 415 Mass. at 676.
A. Was Chanson Handicapped within the Meaning of Chapter 15 IB?
Substantial evidence supports the Commissioner’s determination that Chanson suffers from a “mental or physical impairment which substantially limits” a major life activity.[12] G.L.c. 151B, §1(17). Considering the nature, severity, and duration of the impairment as the Commission’s guidelines require, the record *666 amply supports the determination that Chanson is handicapped. See Commonwealth of Mass. Comm’n Against Discrimination Guidelines: Employment Discrimination on The Basis of Handicap at 3 (1998).
Crohn’s disease is incurable, chronic and recurrent. Chanson could experience a severe bout of illness at any time. His disease is characterized by fatigue, weight loss, loss of appetite and bodily fluids, rectal bleeding, chronic diarrhea and an inability to control his bowels. Chanson testified that he sometimes needs to use the bathroom up to twenty times per day. The Commissioner found that this disease substantially impairs Chanson’s ability to work because he cannot perform his job without interruption. Substantial evidence supports these findings.
B. Did Westinghouse Discriminate Against Chanson on the Basis of His Handicap?
An employer may not “dismiss from employment .. . because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation.” G.L.c. 151B, §4(16). To meet his burden of proof before the Commissioner, Chanson was required to demonstrate that (1) he suffers from a handicap, (2) he is a “qualified handicapped person” and (3) Westinghouse fired him because of his handicap.[13] See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997). Once Chanson established a prima facie case of discrimination, the burden shifted to Westinghouse to offer a legitimate, nondiscriminatory reason for its action. Id. Chanson was then required to show that Westinghouse’s reason was a mere pretext. Id.
The Commissioner’s determinations that Chanson met his burden, and that Westinghouse’s proffered reason of “poor performance” for Chanson’s termination was a mere pretext, are supported by substantial evidence in the record. Chanson, a salesman with twenty-two (22) years of experience, never received a performance complaint or warning from the start of his employment in August 1988, until the first onset of his symptoms in June 1989, Westinghouse had awarded Chanson numerous performance bonuses prior to June 1989. After Chanson’s return to work in December 1989, he performed the functions of his job with some accommodation and was not the subject of any complaints until January, 1990. Scrutiny and criticism did not begin until after Chanson informed them of the nature and characteristics of his disease and presented two hospital bills in January 1990.
Remarski testified that he had repeatedly counseled Chanson for his lack of diligence with customers. The Hearing Commissioner attributed minimal weight to this testimony, finding it vague and lacking specific detail. As the Hearing Commissioner noted, despite Remarski’s claim, only two incidents were documented in writing.[14] Remarski could not recall the specific details of any undocumented incident. Credibility is for the Commissioner, not this court. Ramsdell, 415 Mass, at 676.
There is substantial evidence in the record to support the Commissioner’s findings that Chanson could perform the essential functions of his job with reasonable accommodation and that Westinghouse terminated Chanson on the basis of his handicap, not “poor performance."
C. The Emotional Distress Award
Westinghouse contends that there is not substantial evidence to support the $250,000 emotional distress award because the Hearing Commissioner failed to distinguish between symptoms Chanson experienced as a result of his illness and the mental and physical effects of his termination. Alternatively, Westinghouse urges that remitittur is required.[15]
The Commission has broad discretion to fashion remedies to best effectuate the goals of Chapter 151B, see Conway v. Electro Switch Corp., 402 Mass. 385, 387 (1988), and is authorized to award damages for emotional distress. See Lavelle v. MCAD, 426 Mass. 332, 337 (1997); College-Town, Div. of Interco, Inc. v. MCAD, 400 Mass. 156, 169 (1987). Neither expert testimony nor psychiatric counseling is required to establish emotional distress. See Labonte, 424 Mass, at 824; College-Town, 400 Mass, at 169. “The finding of [discrimination] alone permitís] the inference of emotional distress as a normal adjunct of the [employer’s] actions.” Labonte, 424 Mass, at 824, quoting Buckley Nursing Home, Inc. v. MCAD, 20 Mass.App.Ct. 172, 182 (1985) (internal quotations omitted). Substantial evidence supported the Commissioner’s award of $250,000. Chanson and his wife testified that his termination left him devastated. He felt humiliated and depressed and lost all self-esteem. His physical condition also deteriorated, in that he had difficulty eating and experienced constant diarrhea and pain.[16]
Remitittur lies within the sound discretion of the trial judge, but a “judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount.” Bartley v. Phillips, 317 Mass. 35, 40 (1944); see Loschi v. Massachusetts Port Authority, 361 Mass. 714, 715 (1972). It is traditionally left to the trier of fact to assess the degree of harm suffered and decide just compensation. See Labonte, 424 Mass, at 824. The Hearing Commissioner, who was the head of the Commission at the time of Chanson’s proceedings, has broad and extensive experience in discrimination cases, and the benefit of seeing the parties in person. Such a firsthand view leads to a better assessment of the harm inflicted in a particular case than a paper record. The size of this award does not so ”shock[] the sense of justice as to compel the conclusion” that the Commissioner was influenced by “partiality, prejudice, mistake or corruption.” Labonte, 424 Mass, at 825, quoting Mather v. Griffin Hosp., 207 Conn. 125, 139 *667 (1988).[17] This Court declines Westinghouse’s invitation to grant a remitittur.
III. Chanson’s Motion for
Attorneys Fees and Costs
Chanson now seeks attorney’s fees incurred in defending against Westinghouse’s two motions for reconsideration brought before the Commission prior to this appeal and for defending against Westinghouse’s G.L.c. 30A petition before this Court. [18] The language of Chapter 151B, the purposes behind the statute and public policy all support an award of reasonable attorney’s fees to Chanson.
A. Authority for the Award
1. Westinghouse’s Two Motions for Reconsideration
Westinghouse sought review of the Commission’s decision to affirm the Hearing Commissioner’s decision via two motions for reconsideration. Chanson responded and prevailed, as the Commission declined to address these motions because of their procedural impropriety.
G.L.c. 15 IB, §5 provides that a prevailing party before the Commission is entitled to reasonable costs and attorneys fees. Chanson qualifies as such and is thus entitled to reimbursement for attorneys fees and costs incurred in responding to Westinghouse’s motions. It does appear to this Court, however, that the appropriate forum for that application is the Commission. See G.L.c. 151B, §5; Stowe v. Bologna, 417 Mass. 199, 203 (1994); Robbins v. Robbins, 19 Mass.App.Ct. 538, 543 n. 10 (1985). Therefore, this Court will reduce the requested fees by the amount of time spent responding to Westinghouse’s motions for reconsideration at the Commission.
2. Westinghouse’s G.L.c. 30A Petition
The statute does not explicitly provide for an award to Chanson of attorneys fees for the cost of defending in this Court the Commission’s damages award. It is, however, adequately supported by the general purposes of the anti-discrimination law, analogous federal statutes and the policy behind the granting of attorneys fees in discrimination cases.
Generally, the “American Rule” governs the award of attorneys fees. See Bournewood Hospital, Inc. v. MCAD, 371 Mass. 303, 311 (1976); Comm’r of Ins. v. Mass. Accident Co., 318 Mass. 238, 241 (1945). Under this rule, attorneys fees may be awarded only when a statute so authorizes. See Bournewood Hospital, 371 Mass, at 308.
The purpose behind Chapter 15IB, the elimination of unlawful discrimination, dictates allowance of attorneys fees at this level. Fee awards are designed to encourage individuals to seek judicial relief, so that to a certain extent, the statute relies on the efforts of private attorneys for its effective enforcement. The express provisions for attorneys fees in §§5 and 9 reflect this reality. In pursuit of these goals, the legislature mandated that §9 be broadly construed: “The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof ...” To deny fee awards in a G.L.c. 30A appeal would contravene the intent of the legislature. It might also discourage private attorneys from persevering with such claims beyond the administrative stage of proceedings. See Mass. Dep’t of Public Health v. Sch. Comm, of Tewksbury, 841 F.Supp. 449, 456 (D.Mass. 1993) (part of purpose of fee award is to attract competent counsel).
Analogous federal statutory provisions concerning fee awards are instructive in construing Chapter 151B. See Commonwealth v. Dowd, 37 Mass.App.Ct. 164, 167-68 (1994) (court looked to Fair Housing Act, 42 U.S.C. §§3601-3631, for guidance in determining appropriateness of Chapter 15IB fee award to Attorney General). The federal counterpart to Chapter 15 IB, the ADA, contains an expansive fee award provision:
In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party ... a reasonable attorneys fee, including litigation expenses, and costs . . .
42 U.S.C. §12205. Therefore, a court may, in its discretion, award attorneys fees to a prevailing party in an appeal regarding an ADA case. See Roe v. Cheyenne Mountain Conf. Resort, Inc., 124 F.3d 1221, 1232 (10th Cir. 1997).
“(F]ee awards are an integral part of the remedies necessary to obtain compliance” with 42 U.S.C. §1983. S. REP. NO. 94-1011, 94th Cong., 2d Sess. (1976), reprinted in 5 U.S.C.C.A.N. 5908, 5913.; see also Collins v. Chandler Unified Sch. Dist., 644 F.2d 759, 764 (9th Cir.), cert. denied, 454 U.S. 863 (1981) (act’s language must be liberally construed to achieve Congress’s purpose of enforcing civil rights laws); Mid-Hudson Legal Serv., Inc. v. G&U, Inc., 578 F.2d 34, 37 (2d Cir.), appeal after remand, 465 F.Supp. 261 (S.D.N.Y. 1978) (Congress intended courts to use broad remedies to achieve goals of civil rights laws). The policies underlying our federal anti-discrimination laws apply with equal force to Chapter 151B.
The weight of authority and statutoiy goals jointly mandate an award of attorneys fees to Chanson for expenses incurred in this G.L.c. 30A appeal. This conclusion “comports with . .. the legislative intent as well as ‘with common sense and sound reason.’ ” Fontaine v. Ebtec Corp., 415 Mass. 309, 322 (1993) (internal quotations omitted).
B. The Reasonableness of Chanson’s Fee Request[19]
Under the “lodestar” approach set forth in Hensley v. Eckerhart, 461 U.S. 424 (1983), and adopted in Fontaine, the propriety of an attorneys fee request is determined by considering the reasonableness of the *668 amount of time spent and the reasonableness of the attorney’s hourly rate. See Stowe v. Bologna, 417 Mass. 199, 203 (1994); Fontaine, 415 Mass, at 324-25. This Court may also consider the novelty and complexity of issues involved and the amount of the judgment at issue. See Stowe, 417 Mass, at 204-05; Fontaine, 415 Mass, at 326.
Jeffrey Kaye (“Kaye”), Chanson’s trial attorney, seeks fees in the amount of $24,100.00 for himself and $2,430.00 for the services of Carol C. Brown (“Brown”), a specialist in ERISA. By affidavit, Kaye demonstrates that the amount of time reflected in this application was recorded contemporaneously with the work which was performed. He also demonstrates his skill and experience as a trial lawyer. When Westinghouse filed its Motion for Judgment on the Pleadings asserting its preemption defense, he engaged Brown’s services. The ERISA issues are complicated and technical. It was appropriate for Kaye to engage an expert to assist him.
Kaye’s rate of $200.00 per hour, supported by his affidavit and that of Attorney Anthony DiFruscia, is well within that of other experienced trial lawyers in the Boston area. His skill was well demonstrated by the success he has had in this case. His application includes, however, some time which is not compensable in this Court. First, the time spent defending against Westinghouse’s motions for reconsideration submitted to the Commission must be approved, if at all, by the Commission. Kaye spent six (6) hours on those tasks. Second, Chanson moved to dismiss Westinghouse’s Complaint and opposed Westinghouse’s Motion to Amend its complaint. Neither of these motions was successful. Kaye spent hours on these tasks and none of it is compensable. Third, Kaye spent twenty (20) hours on research in opposition to Westinghouse’s Motion for Judgment on the Pleadings which was based almost entirely on the preemption argument and thirty-seven (37) hours writing the brief in support. Since Kaye had the support of his expert on the ERISA part of the motion, the Court is of the opinion that these amounts of time are not reasonable. The Court will reduce the time spent on these activities by twenty-five (25) per cent. Lastly, Kaye requests compensation for seven (7) hours spent in preparation for the oral argument on the Motion for Judgment on the Pleadings. While the Court appreciates the complexity of Westinghouse’s argument, the Court is of the opinion that this amount of time, by the person who wrote the brief in the first place, is overstated. The Court will reduce this request by three (3) hours.
Brown’s rate and hours are appropriate for the worx performed and will be allowed in full.
Neither Kaye nor Brown has made any request for costs and, therefore, none will be allowed. Except for one (1) hour that appears to be related to work done on the application for attorneys fees, see entry for July 2, 1997 on Statement on Legal Services, neither Kaye nor Brown has requested compensation for work performed in support of the application for attorneys fees and, therefore, other than that one hour, none will be allowed.
ORDER
For the foregoing reasons, it is ORDERED that the decision of the Commission be AFFIRMED.
It is further ORDERED that Chanson’s motion for attorneys fees be ALLOWED in part and DENIED in part. Westinghouse is ordered to pay $16,780 to Chanson for his attorneys fees.

 The facts are taken from the Commission's Administrative Record.

 Westinghouse is a self-insurer and pays its own medical bills directly, through its health plan administered by Blue Cross.

 The First Circuit has concluded that ERISA preemption is an affirmative defense which may be waived if not timely pleaded. Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995). “[interests in uniformity which Congress hoped to serve in ERISA did not extend to permitting defendant corporations, often more sophisticated about ERISA 1 than individual plaintiffs, to sit on their hands and not claim the defense until the last minute." Id. at 448. When the Supreme Judicial Court and a federal appeals court reach opposing conclusions regarding a matter of federal law as to which the United States Supreme Court has not spoken, however, this Court is bound by the decision of the Supreme Judicial Court. Brown v. Palmer Clay Products Co., 290 Mass. 108, 110, aff'd, 297 U.S. 227 (1935).

 Section 510 provides, “It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . .” 29 U.S.C. §1140.

 The statute of limitations, if the claim does not relate back to the commencement of the action, has run. See 29 U.S.C. §1113. This may be one reason courts have frowned on allowing the employer to sit back and defend belatedly by using an ERISA preemption “gimmick.” See Rokohl v. Texaco, 77 F.3d 126, 130 (5th Cir. 1996).

 During cross-examination, Chanson was asked “Isn’t it also here [in the Complaint] that you indicated that you thought the reason you were being discriminated was because on January 15th I received a bill for my hospital stay that was a very large amount? Isn’t that what you thought the reason for being discriminated was?” TR. at 65. Chanson answered affirmatively. A review of the complaint demonstrates that is not what he said in his Complaint. He described the presentation of the bill in the rendition of the facts; he did not describe it as the cause of his termination.

 For cases on the other side of the divide, that is, which do affect the administration of plans, where people make claims for benefits under a plan, or where they make claims that benefits were wrongfully withheld, see e.g., Ingersoll Rand, 498 U.S. at 135-36 (state law claim based on theory of employer’s desire to avoid making pension contributions); Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 61 (1987) (state law claims for wrongful termination and failure to promote based on theory of retaliation for presentment of worker’s compensation claim); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 43-44 (1987) (common law claims based on alleged improper processing of claim for benefits under ERISA *669 plan): Shaw, 463 U.S. at 97 (state law controlled structuring of ERISA plan); Turner, 127 F.3d at 196-97 (widower making claim of wrongful denial of medical care sought by his wife); Andrews-Clarke v. Travelers Ins. Co., 984 F.Supp. 49, 52 (D.Mass. 1997) (claims of medical malpractice, wrongful death, etc., brought against the claims manager and the insurer preempted by ERISA).

 In a §510 case, a claimant must prove that he had an opportunity to attain rights under an ERISA benefit plan; he was qualified for the position at issue; and he was subjected to adverse action under the circumstances that give rise to an inference of handicap discrimination. Lehman v. Prudential Ins. Co., 74 F.3d 323, 330 (1st Cir. 1996). In a Chapter 15IB case, a claimant must prove that he is handicapped within the meaning of the statute; he is qualified to perform the essential functions of the job with or without reasonable accommodation; he was terminated or otherwise subjected to an adverse action by his employer; and the position he occupied remained open and the employer sought to fill it. Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 11 (1998) Although the facts used to prove the claim may be the same, that does not mean the claims are the same. See Dykes v. Depuy, Inc., 140 F.3d 31, 37 (1st Cir. 1998) (violations of Chapter 151B and ERISA are separate and distinct causes of action).

 The Commissioner stated, “I find that criticisms of Complainant’s job performance were directly related to his illness and the cost of treatment.”

 When Senator Lowell Weicker introduced the ADA in April of 1988, he did not dispute that the bill would require employers to endure substantial financial costs. However, he stated that ”[t]he costs associated with this bill are a small price to pay for opening up our society to persons with disabilities.” Epstein, supra at 422-23 (citing 134 Cong. Rec. S. 5109 (daily ed. April 28, 1988)).

 Although the Hearing Commissioner’s decision does not specify which major life activity of Chanson’s is limited, the Commission found that Chanson’s abilify to work is so limited. Decision of the Full Commission at 3. G.L.c. 151B, § 1(20) specifically includes working in its list of “major life activities.” The Commission points out in its brief that Chanson is limited in two major life activities; namely, working and the ability to control his bowel movements.

 Chanson was not required to show that he was terminated solely because of his handicap. See Dartt, 427 Mass, at 10.

 As to the first, on June 14, 1989, Remarski testified that it was not a warning, but merely a “counseling.” The second was in February 1990, when Chanson was placed on probation.

 A1 though Westinghouse did not file a formal motion for remitittur, this Court will address the issue.

 Experiencing distress from his disease does not necessarily mean that Chanson is not entitled to damages for emotional distress resulting from his termination. Indeed, the exacerbation of his illness and consequent distress resulting from his unwarranted termination may support a higher award of damages. See EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995) (emotional distress of person suffering from illness is “considerably greater than that suffered by the ordinary victim of a wrongful discharge").

 The Commissioner’s award is within the realm of other emotional distress awards. See e.g., City of Salem v. MCAD, 44 Mass.App.Ct. 627, 646 (1998) ($100,000 emotional distress award in race discrimination case); Powers v. H.B. Smith Co., 42 Mass.App.Ct. 657, 665 (1997) ($350,000 emotional distress award in age discrimination case); see also, Wilson v. General Motors Corp., 454 N.W.2d 405, 414 (Mich.App. 1990) ($375,000 emotional distress award in gender and race discrimination case); Jenkins v. S.E. Mich. Chapter, American Red Cross, 369 N.W.2d 223, 230 (Mich.App. 1985) ($500,000 emotional distress award in race discrimination case).

 Westinghouse argues that since Chanson was not named as a defendant by Westinghouse in this appeal, and moved to intervene in this action, he is not entitled to attorneys fees. Another cynical argument. Chanson is trying to protect the substantial award he received at the Commission. He is an indispensable party. See Mass.R.Civ.P. 19(a), 24(a)(2); Piggott v. Agnew, 57 Mass.App.Dec. 120, 124(1976) (all persons who have financial interest are necessary parties).

 In its opposition to Chanson’s motion, Westinghouse seeks to reserve its response to the reasonableness of Chanson’s request. Since Westinghouse possessed all the necessary information and had ample time to respond, this Court addresses Chanson’s motion.